Filed 6/28/24  K.G. v. Superior Court CA1/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| K.G.,<br><br>          Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF CONTRA COSTA COUNTY,<br><br>          Respondent;<br><br>CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU,<br><br>          Real Party in Interest. | A170159<br><br>Contra Costa County<br>Super. Ct. Nos. J23-00370,<br>J23-00371 & J23-00372) |

In this juvenile writ proceeding, K.G. (mother) seeks extraordinary relief from the juvenile court's order terminating reunification services and setting a permanency planning hearing pursuant to section 366.26 of the Welfare and Institutions Code[1] with respect to her three children—C.G. (born July 2017) and twins W.M.G. and W.D.G. (born April 2021).  Mother argues that the juvenile court erred when it declined to extend her reunification

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.  The alleged fathers of the minors are not involved in these writ proceedings.

services at the six-month review hearing.  She also claims the Contra Costa County Children and Family Services Bureau (Bureau) failed to provide her with reasonable reunification services.  We deny the petition.

## I.  BACKGROUND

In May 2023, two Bureau social workers made an unannounced visit to the home of mother and her three children in response to a referral alleging mother's physical abuse of C.G.  The household also included the maternal grandmother, a maternal aunt, and two maternal cousins—10-year-old Ko.G. and seven-year-old H.G.—whom the maternal relatives had been caring for since February 2023 because their mother was unavailable.[2]  Mother and her children were not home, but both the maternal grandmother and the maternal aunt expressed concern for her mental health.  They said that the previous week mother woke the household at 6:00 a.m. by playing loud music; cut off 8 to 10 inches of H.G.'s hair in retaliation for the child having accidentally cut some of the twins' hair three months earlier; and grabbed Ko.G. by the hair and shoulder and swung him around the room, causing him to fall and hit his face on a hard edge of the maternal grandmother's hospital bed resulting in a bump that was sore to the touch.  During the altercation, mother pushed the maternal grandmother to the floor and threw a wooden table at the maternal aunt.  According to the women, mother was diagnosed with schizophrenia but was inconsistent with her mental health treatment.

---

[2] During this visit, the social workers observed the maternal grandmother and the maternal aunt to have mobility issues due to their weight.  In addition, the maternal grandmother used oxygen, and the maternal aunt detailed other personal health issues.  Their impaired physical ability to protect the children was a factor in the minors' removal from the family home.

Law enforcement reportedly had been called to the house numerous times leading to mother's repeated involuntary hospitalizations.

When mother came home with the minors, she immediately confronted the social workers. She was visibly agitated, yelling loudly, spitting while speaking, and pacing. Mother stated the maternal grandmother called the police on the day of the incident because " 'I'm crazy!' " and acknowledged she could be physically aggressive. At times during the conversation mother became irate over unrelated topics, screaming profanities loud enough for the neighbors to hear. Her thought process was tangential and very difficult to track. And her emotions were labile, spontaneously transitioning from happiness, anger, despair, and humor within the span of minutes. Mother stated she did not agree with all of the medications she was prescribed because they were too much and caused unwanted side effects.

H.G. confirmed the incident, stating all of the children had been present, mother had been screaming and calling everyone the " 'B word,' " and she felt scared and unsafe. She said she accidentally cut the twins' hair at one point when using scissors to cut out rubber bands. Ko.G. also said he felt unsafe, verified the incident, and reported that the police came and took mother to " 'the crazy house.' " He described another time when mother had other children hold him down while she hit him with a belt because he did not want to watch a movie with her. C.G. disclosed mother " 'whooped' " her on her bottom with a belt when she was in trouble. According to C.G., mother also " 'whooped' " H.G., and C.G. saw a mark. C.G. remembered the police arresting mother after she " 'destroyed the whole house.' "

The condition of the home was unsanitary, with excessive trash, evidence of urine and feces on various surfaces, an exposed electrical outlet, and mother's marijuana bong within reach of the minors. Urine-soaked

3

clothing and bedding were observed in mother's bedroom, and mother explained she often peed on herself, but she would not do laundry because there were " 'water bugs' " in the laundry machines since the home's water had been shut off for a month.  Mother admitted that two large, fist-sized holes in her bedroom door were from her punching as " 'a way not to hit her family.' "  Flies were observed throughout the home.  The Bureau detained the three young minors on May 25, 2023, and they were placed in foster care together with Ko.G. and H.G.

The Bureau filed juvenile dependency petitions on May 30, 2023, alleging that C.G. was described by subdivisions (b)(1) and (d) of section 300 due to mother's mental health and substance abuse issues and her use of inappropriate physical discipline, along with some inappropriate sexual touching among the children in the household.  The twins' petitions alleged they were described by subdivisions (b)(1), (d), and (j) of section 300 based on the same facts.  The minors were formally detained at the detention hearing the next day.

According to mother, she was evicted from the family home after the minors were detained, and the maternal grandmother and maternal aunt served her with a restraining order.  She therefore entered a dual diagnosis shelter.  However, by August 2023, mother was discharged from that shelter for failure to participate in its programming.  She moved to another shelter but did not engage in any services.  Mother informed the social worker she did not want to work with the Bureau on reunification and requested the children be returned to the maternal grandmother.  Mother did not consistently attend her weekly visits with the minors, despite being given transportation assistance.  She told the social worker she was no longer

interested in visiting her children because she had no transportation and did not believe she would reunify.

The court took jurisdiction over the minors on August 23, 2023, after declining to continue the hearing. Mother was not present. At the dispositional hearing on that same date, the minors were adjudged juvenile court dependents and formally removed from mother's care. Reunification services were ordered for mother in the hopes she would have a change of heart and reengage with the Bureau.

In its report for the six-month review hearing, the Bureau recommended that mother's reunification services be terminated because she had not meaningfully engaged in services or demonstrated any behavioral change. Mother contested the recommendation, and the matter was set for hearing on March 6, 2024. At the hearing, mother testified that she wanted further reunification services and would be willing to engage in mental health assessments. She found public transportation confusing, so she mostly had weekly phone contact with her children, which sometimes did not occur. On cross-examination, mother acknowledged she had been given information about parenting classes and drug testing, but stated she did not understand how to engage in them. She denied receiving information regarding counseling, anger management, substance abuse treatment, or mental health assessment. She would use BART or bus tickets to attend visitation if she was given them. The social worker offered her these transportation resources, but she declined visitation because she felt like she was not in a suitable place to receive the tickets. Mother believed her children were removed because she cut her niece's hair and the house was not clean. She denied any "whoopings" or any mental health issues. Although she conceded she had been diagnosed with schizophrenia, she felt it was no

longer an issue. She did not participate in any meetings with the Bureau to discuss how they could support her. As of February 2024, mother began receiving Social Security benefits for her schizophrenia which would help her make visits and go to parenting classes without having to rely on public transportation.

Mother's prior social worker testified regarding e-mailing mother referrals for parenting classes, counseling services, drug treatment, and drug testing. He also e-mailed her the web link for a family team meeting he had previously discussed with her. In addition, he sent her a letter at the shelter where she was residing (the address of which she had designated to the court as her official mailing address) with referrals for services and notice of a court hearing, and he gave her a similar letter in person on July 6, 2023. At the in-person meeting, the social worker went over the referrals with mother.

After mother was discharged from the shelter due to noncompliance with services, she told the social worker she was unaware of her current address, did not want to meet in person, and did not want to continue engaging with the Bureau. Mother had two in-person visits with the minors while he was her social worker, but then missed visits and finally informed him she was not interested in visitation or services. She wanted the children placed with the maternal aunt or maternal grandmother. Although the social worker strongly urged her to engage in services and visiting, mother refused and declined an in-person visit from the worker.

Mother's current social worker testified that, when she took over the case, mother's whereabouts were unknown. After she first reached mother by telephone in November 2023, mother consistently stated she did not want to participate in services. She just wanted the children to be with her family. Every time she was in contact with mother, the social worker asked her if she

wanted in-person visitation, but mother stated she only wanted phone calls. The social worker offered to bring mother tickets for public transportation and offered to meet her at the social services office in Antioch, but mother declined.[3]

After argument on April 3, 2024, the court terminated reunification services and set the matter for a permanency planning hearing pursuant to section 366.26 so that a permanent out-of-home placement could be established for C.G. and the twins. In doing so, the court acknowledged mother's mental health struggles but queried: "What more should [the social workers] have done in this case? And short of actually going out to the shelter and physically walking with Mom to each of the appointments in the referrals, I'm struggling what more [*sic*] they could have done because it seems like they were reaching out to her." The court found the social workers

---

[3] The current social worker also filed an update with the court for the period between the first day of the contested hearing (March 6, 2024) and the second day of the hearing (April 3, 2024). Mother requested in-person visitation on March 18, which the social worker arranged for March 22 and which reportedly went well. On March 19, the social worker completed a new referral for drug testing and e-mailed the instructions to mother at her request. Mother tested negative on March 22. On March 21, 2024, the social worker also e-mailed mother resources for parenting education, anger management, and counseling/mental health for her county of residence. Both the current and former social workers met with mother in person on March 25, went over her case plan with her in detail, and provided her with public transportation assistance. Mother agreed to various mental health services but stated she did not believe anything was wrong with her. She continued to minimize her culpability for the removal of her children. A second visit was set for March 29 and mother reportedly enrolled in anger management. Nevertheless, the Bureau still recommended that services be terminated due to mother's untreated mental health issues, her lack of insight into those issues, and her denial of the behaviors that led to the removal of her children.

more credible than mother on the issue of reasonable services. It also found mother not only failed to engage in services but failed to update the Bureau on her whereabouts, return phone calls, update contact information, or even visit her children, despite the provision of transportation resources. In determining not to continue the matter to a 12-month hearing, the court noted mother was not taking recommended medication for her mental health condition, although she was receiving governmental benefits for it. The court saw no likelihood of "any reasonable degree of success if services were continued" and concluded any further provision of services would not be in the children's best interests. It therefore set permanency planning hearings for all three minors on August 7, 2024. Mother's timely petitions followed.

## II. DISCUSSION

When a dependent child is removed from parental custody, the juvenile court ordinarily must order child welfare services for the minor and the parent for the purpose of facilitating reunification of the family. (§ 361.5, subd. (a).) As is relevant here, for a child under three years of age at the time of removal (along with members of a sibling group including that child), reunification services are presumptively limited to six months. (*Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 843.) This is because the " ' "unique developmental needs of infants and toddlers" ' [citation] justif[y] a greater emphasis on establishing permanency and stability earlier in the dependency process." (*M.V. v. Superior Court* (2008) 167 Cal.App.4th 166, 175 (*M.V.*).) Thus, if "the court finds by clear and convincing evidence that the parent failed to participate regularly and make substantive progress in a court-ordered treatment plan, the court may schedule a hearing pursuant to Section 366.26 within 120 days." (§ 366.21, subd. (e)(3).) However, if the juvenile court finds that there is a substantial probability that the child may

be returned to his or her parent within the extended timeframe or that reasonable services have not been provided, the court must continue reunification services to the 12-month date. (*Ibid*.)

We uphold a juvenile court's findings supporting termination of reunification services if supported by substantial evidence. (*J.H. v. Superior Court* (2018) 20 Cal.App.5th 530, 535.) To the extent a particular finding must be made by clear and convincing evidence, we "must determine whether the record contains substantial evidence from which a reasonable trier of fact could find the existence of that fact to be highly probable." (*In re V.L.* (2020) 54 Cal.App.5th 147, 149, 155.) In contrast, as set forth above, the juvenile court law "places discretion in the hands of the trial court as to whether to schedule a hearing to terminate parental rights" at the six-month mark. (*M.V.*, *supra*, 167 Cal.App.4th at p. 179.) Indeed, " '[a]t the six-month review, the court has discretion to continue the case and forebear from scheduling a [section 366.26] hearing even if it does not make the finding there is a substantial probability the child may be returned to his or her parent.' " (*F.K. v. Superior Court* (2024) 100 Cal.App.5th 928, 935.) We therefore review a decision to schedule a permanency planning hearing in this timeframe for an abuse of discretion.

Here, the juvenile court did not find either a substantial probability of return or failure to provide reasonable services. And mother does not challenge the juvenile court's findings, made by clear and convincing evidence, that she failed to participate regularly and make substantive progress in her court-ordered treatment plan. Thus, the juvenile court's decision to set a permanency planning hearing for the three minors was a discretionary decision.

9

Mother argues that the juvenile court erred because it did not sufficiently consider that she had significant mental health issues, went through periods of hopelessness, did not have stable housing, and was just beginning to make efforts to engage in services at the time of the hearing. Mother also notes that she had a good relationship with her children which was worth preserving. However, by her choice, mother had only seen her young children *four* times in the 10 months prior to the hearing. And, according to the social worker, the children were bonded with the current caregiver and considered the placement their home. Moreover, the court was well aware of mother's mental illness and expressed concern that she was not taking her medication against the advice of her doctors. Under such circumstances, the court viewed continuation of services to be contrary to the best interests of the minors and unlikely to succeed. The record amply supports these conclusions, especially since the 12-month mark in the case was under four months away at the time mother's services were terminated. (§§ 361.5, subd. (a)(1)(A), 361.49, 366.21, subd. (e)(1).) There was no abuse of discretion.

We easily reject mother's argument that the Bureau failed to design reunification services focused on her mental illness, and therefore the services offered or provided were unreasonable. The services offered were specifically designed to help the Bureau understand mother's mental health issues and offer appropriate support, but mother simply decided not to avail herself of them, including visitation with her young children. Indeed, she was initially residing in a dual diagnosis shelter expressly designed to both provide her housing and help her with any mental health and substance abuse issues, but she was discharged for her failure to comply with the program. As the juvenile court noted, it is hard to imagine what further

efforts the social workers could have made when faced with mother's failure to keep in consistent contact and her repeated assertions that she did not want to participate in services or reunify. (*In re T.W.-1* (2017) 9 Cal.App.5th 339, 348 [" '[r]eunification services are voluntary, and cannot be forced on an unwilling or indifferent parent' "].) In short, mother has not established error with respect to the reasonableness of the services offered to her.

### III.  DISPOSITION

The petition is denied on the merits. (See § 366.26, subd. (*l*)(1)(C), (4)(B).) Because the permanency planning hearing in this matter is set for August 7, 2024, this opinion is final as to this court immediately. Mother's request for a stay of the permanency planning hearing is denied as moot.

11

SIGGINS, J.*

WE CONCUR:

BANKE, ACTING P. J.

LANGHORNE WILSON, J.

A170159
*K.G. v. Superior Court*

---

\* Retired Presiding Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

12